J-S31013-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: L.A.C.H. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.H. & A.H. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1911 WDA 2016 |

Appeal from the Order Entered November 17, 2016
In the Court of Common Pleas of Clarion County
Orphans' Court at No(s):  No. 227 OC 2016

BEFORE:   PANELLA, DUBOW, and FORD ELLIOTT, P.J.E.

MEMORANDUM BY PANELLA, J.                    **FILED JUNE 2, 2017**

C.H. ("Father") and A.H. ("Stepmother") appeal the order entered on November 17, 2016, that denied their petition seeking to involuntarily terminate the parental rights of K.D.H. ("Mother"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1) and (b), to L.A.C.H. ("Child"), the female child of Father and Mother, born in August 2008. We affirm.

In its opinion, the orphans' court set forth the factual background and procedural history of this appeal, which we adopt herein. *See* Orphans' Court Opinion, 1/24/17, at 1-14 (unpaginated). On September 28, 2016, Father and Stepmother filed the petition seeking to involuntarily terminate

the parental rights of Mother to Child pursuant to section 2511(a)(1),[1] and a report of intention for Stepmother to adopt Child. The orphans' court held an evidentiary hearing on November 16, 2016. At the hearing, Father and Stepmother presented the testimony of Cami Hrisak, Child's therapist, as an expert as a licensed clinical social worker and in the field of counseling. Stepmother and Father testified on their own behalf. They also presented the testimony of S.J., who is Child's teacher at school. Finally, Father and Stepmother presented the testimony of D.S., the headmaster at Child's school.

Mother testified on her own behalf. She also presented the testimony of Jory Hubler, who is employed at Misty Isle Bridges; and S.M. and K.W., who are Mother's friends.

Based on this testimony and the documentary evidence admitted at the hearing, the court entered its order denying the termination and adoption petitions. Father and Stepmother timely filed a notice of appeal and concise statement pursuant to Pa.R.A.P. 1925(a)(2)(i).

On appeal, Father and Stepmother raise three issues:

1. Did the Orphans Court abuse its discretion and err as a matter of law in failing to consider the statute in 23 Pa.C.S.A. § 2511 (a)(1) which states that "[t]he parent by conduct

---

[1] The petition provided that Father and Stepmother were married in June 2014, and that Father had primary physical custody of Child since a March 6, 2015 stipulation and custody consent order, which provided Mother an opportunity for supervised visits with child through Misty Isle Bridges.

continuing for a period of at least six months immediately preceding the filing of the petition **_either_** has evidenced a settled purpose of relinquishing parental claim to a child **_or_** failed to perform parental duties." [emphasis added]

...

2. Did the Orphans Court abuse its discretion and err as a matter of law in failing to consider the statute in 23 Pa.C.S.A. § 2511 (a)(2) which states that "[t]he **_repeated and continued incapacity_**, abuse, neglect **_or refusa_**l of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or **_will not be remedied by the parent_**." [emphasis added]

…

3. Did the Orphans Court abuse its discretion and err as a matter of law in failing to consider under "Other considerations" (23 Pa.C.S.A. § 2511(c)[)] that Mother had been designated a sexual abuse perpetrator by the Pennsylvania Department of Welfare Children and Youth Services under the Child Line Abuse Registry for acts perpetrated on the child in question.

…

Father's and Stepmother's Brief, at 5-6 (emphasis and brackets in original). [2]

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because

_____

[2] We note that the concise statement did not include the statutory section in the third issue. We, nevertheless, find the issue preserved for our review.

the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

[T]here are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012) (internal citations omitted).

The burden is upon the *petitioner* to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *See In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained that

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id*. (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

In their brief, Father and Stepmother contend that the orphans' court abused its discretion or erred as a matter of law in concluding that the evidence was insufficient to support the involuntary termination of Mother's

parental rights under § 2511(a)(1). Alternatively, they argue the court abused its discretion or erred as a matter of law in concluding that the evidence was insufficient to support the involuntary termination of Mother's parental rights under § 2511(a)(2).[3] Finally, they urge that the court abused its discretion in failing to consider, under "Other considerations,"[4] that Mother had been designated a sexual abuse perpetrator by the Pennsylvania Department of Welfare Children and Youth Services under the Child Line Abuse Registry for acts perpetrated on Child.

This Court may affirm the lower court's decision regarding the termination of parental rights with regard to any one subsection of section

---

[3] The orphans' court never reviewed § 2511(a)(2), finding that section was not raised in the petition. We agree with the court that Father and Stepmother waived § 2511(a)(2) by failing to raise that section in the lower court. ***See*** Pa.R.A.P. 302(a). The fact that Father and Stepmother raised the claim in their concise statement does not alter our conclusion. ***See Commonwealth v. Watson***, 835 A.2d 786, 791 (Pa. Super. 2003) (stating "[a] party cannot rectify the failure to preserve an issue [for appeal] by proffering it in response" to the court's request for a Rule 1925(b) statement).

[4] Father and Stepmother cite § 2511(c) as providing for "Other considerations." This citation appears to be a typographical error, as the section captioned "Other considerations" is § 2511(b), *infra*. Section 2511(c), is captioned, "**(c) Right to file personal and medical history information**." Section 2511(c) provides, "At the time the decree of termination is transmitted to the parent whose rights have been terminated, the court shall advise the parent, in writing, of his or her continuing right to place and update personal and medical history information whether or not the medical condition is in existence or discoverable at the time of adoption, on file with the court and with the Department of Public Welfare pursuant to Subchapter B of Chapter 29 (relating to records and access to information)." (footnote omitted).

2511(a), along with section 2511(b). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Section 2511(a)(1), (2), and (b), provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

With respect to § 2511(a)(1), our Supreme Court has held that

[o]nce the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

***In re Adoption of Charles E.D.M.***, 708 A.2d 88, 92 (Pa. 1988).

Further, this Court has stated that

the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

***In re B.,N.M.***, 856 A.2d 847, 854-855 (Pa. Super. 2004) (citations omitted).

Father and Stepmother argue that the record clearly established that Mother's conduct over the six months immediately preceding the filing of the petition demonstrated that Mother had a settled purpose of relinquishing her parental claim and failed to perform her parental duties with regard to Child during the six-month period preceding the filing of the termination petition.

In its opinion, the court ably and methodically considered the evidence presented at the hearing, and addressed Father's and Stepmother's issues. The  court's credibility determinations are supported by competent evidence in the record, so we will not disturb them. Accordingly, we adopt the court's discussion herein. **See** Orphans' Court Opinion, 1/24/17, at 15-18 (unpaginated).

Next, in regard to Father's and Stepmother's third issue, that the court failed to properly consider Mother's record as "indicated" for child abuse as "Other considerations" under the Adoption Act, **see** Orphan's Court Opinion,

1/24/17, at 4-5 (explaining circumstances of the "indicated" finding) (unpaginated), we view this issue as a matter being raised in relation to Child's needs and welfare, under § 2511(b), **see** note 4, *supra*.

Here, the court found, on the record, that there had been a fairly strong bond between Mother and Child at one time in this matter, and that there might still be a bond. **See** N.T., 11/16/16, at 268. The court, however, was unable to determine the present existence of a bond because of the interference of Father and Stepmother with Mother having the supervised visitation to which she was entitled. **See id**., at 267-268. Thus, the court found that Father and Stepmother had failed to sustain their burden of proof. **See id**., at 268-269.

We have thoroughly reviewed the record, the parties' briefs, and the applicable law with the above standards of review in mind. The record supports the court's factual findings, and the court's legal conclusions are not the result of an error of law or an abuse of discretion. As we agree with the court that termination of Mother's parental rights under § 2511(a)(1) was not warranted, and under section 2511(a)(2) was waived, the court properly did not proceed to conduct a § 2511(b) analysis.

We find no abuse of the court's discretion in failing to find that Mother's record as "indicated" for child abuse impacted on Child's needs and welfare under § 2511(b). The court found from the evidence that Father and Stepmother had interfered with Mother's previous close relationship with

Child by their placement of insurmountable obstacles between her and Child, so that Father and Stepmother interfered with the bond between Mother and Child. *See* Orphans' Court Opinion, 1/24/17, at 18 (unpaginated). This determination is supported by competent evidence in the record.

Accordingly, we affirm the orphans' court's order based on the discussion in the court's opinion entered on January 24, 2017. *See* Orphans' Court Opinion, 1/24/17, at 15-18 (unpaginated).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/2/2017

**IN THE COURT OF COMMON PLEAS
OF CLARION COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION**

**RECEIVED**

JAN 2 4 2017

IN RE:
ADOPTION OF L.A.C.H.           No. 16-16-227    BY
(d.o.b. ███████2008)

Millin, P.                                    January 23, 2017

## OPINION

The petition to involuntarily terminate the parental rights of the natural mother was filed on behalf of the natural father and stepmother who desires to adopt on September 28, 2016. The petition alleges as grounds for the termination at paragraph 10 of the petition: **"The natural mother, by her conduct, has for a period in excess of six (6) months, clearly indicated a settled purpose of relinquishing parental claim to the adoptee. She has refused and failed to perform any parental duties whatsoever."** This is an allegation under 23 Pa.C.S.A. Section 2511 (a)(1). No other section of the statute was cited in the petition as possible grounds for termination. After a hearing on November 16, 2016 this court entered an order denying the petition for involuntary termination. The petitioners have appealed that decision. This opinion is entered to further explain the rationale of the court.

Op.

The relevant facts are as follows:

The natural father is C. J. H., born July 15, 1987. The natural mother is K. D. H., born June 5, 1988. The step mother and proposed adopting parent of the child is A. H., born March 12, 1990. The child is L.A.C.H., born ███████ 2008. (Transcript "T" pp. 38-40)

The natural mother and the natural father were married when the child was born and lived together with the child until July 2010 when they separated. (T p.103)

At the time of separation the mother obtained a protection from abuse order against the father which was entered by agreement and which made the natural mother the primary custodian of the child and granted the father partial custody three weekends per month. (T p. 103)

In August 2011 father and mother agreed to a 50/50 custody arrangement. (T p. 158)

On June 19, 2013 the parties entered into a stipulation whereby the father became the primary custodian with mother having partial physical custody every other weekend. The mother testified that prior to the involvement of the stepmother that she and the father successfully co-parented.

A. When we first separated, I had primary physical custody and with him granted the first three weekends of the month. And through the week, I would know he

would have certain days off, so I would let him go ahead and have [child] on those days, or I would work with his mom if they wanted to do something through the week, and I worked with them.

Q. Would you say that you successfully co-parented?

A. We had to go through his mom with the PFA in effect, but yes. (T pp.157-158)

Mother testified that the co-parenting became more difficult when the stepmother became involved. She stated that the stepmother would give her parenting advice at the custody exchange times. (T 159,160)

Mother agreed to give up her weekday contact and to have every other weekend at the time the child was entering school. She stated that she had been living with her mother for a short time and that they had had a falling out and for that reason she agreed to meet with the father and stepmother at the father's attorney's office for the purpose of working out another custody agreement. (T p.160)

Mother took the position that the child should be placed in a public school rather than the church school. She said that "I felt that it would be biased and all one-sided, her going to the school being it's their church, it's their friends, it's their home life all in the one but my concern was, I would be pushed out,

Op. 3

so I requested, can she please be put into a public school..." (T p.160)

The father agreed that the child would be put in the public schools for kindergarten but then told mother that they had missed the deadlines and could not get the child in and he enrolled her in the church school stating that she would be put in the public school the next year, but that was not done. (T pp.161-162)

In January 2015 the father and stepmother became aware that the mother had posted two nude pictures of the child among forty pictures of the child and her half sister that mother had posted on social media. Father and stepmother took the photos to the child's therapist who filed a report with ChildLine on January 20, 2015. (Transcript "T" pp.65-66)

The report initiated a child protective services investigation. The investigation led to a finding by the Department of Human Services that the mother was the perpetrator of an act of sexual abuse. (Petitioners' Exhibit 1)

The report states as the category of abuse "Causing Sexual Abuse or Exploitation of a Child Through Any Act/Failure to Act", and lists the subcategory of abuse as "Actual/Simulated Sexual Activity for the Purpose of Producing Visual Depiction". The outcome explanation states "This case is being indicated

*Op.*

for sexual abuse. Based on the evidence it has been determined that [Mother] was acting recklessly and carelessly when she posted a picture of [child] on the toilet with her genitals exposed. Factors taken into consideration are the hand gesture [Mother] is making, [Mother's] facial expression, as well as [child's] appearance." (Petitioners' Exhibit 1)

Stepmother has a bachelor's degree in early child development and in special education and works as an autism support teacher at the New Story School in DuBois, Pennsylvania. (T p. 38) As such she is a mandatory reporter for child abuse and had just completed "twenty some hours of training" about child sexual abuse. (T pp.65-66)

When father and stepmother became aware that a Children and Youth investigation had been initiated they told the mother that if they allowed the mother to have visitation with the child that the stepmother could possibly lose her license to teach and her job. Father and stepmother sent mother a message via Facebook that they were aware of the children and youth investigation, knew what it was about and would like to postpone the mother's next visit to see how the children and youth investigation turned out. They also told mother that they would tell the child that the visit was postponed due to the fact that the child had the flu. (T p.67)

The children and youth investigation continued and neither the father nor mother were kept informed of the status of it. No one from Children and Youth had told the father or step mother that the mother could not have the custody rights expressed in the existing custody order, but father and step mother "thought it would be best if custody was modified". For that purpose they arranged a meeting with the mother and her boyfriend at the father's attorney's office. The mother was not represented by counsel. (T pp. 67-69)

On March 6, 2015 mother signed a stipulation and custody consent order whereby father was granted primary physical custody with mother having supervised visits through Misty Isle Bridges, a private counseling center. (T p.69)

The mother believed that father and stepmother were trying to help her through the trauma of the Children and Youth investigation and that they would help her in maintaining a relationship with the child, when, in fact, Children and Youth never mandated any change in the custodial arrangement. Father and mother were responsible for the initiation of the Children and Youth investigation by taking the photos to the child's therapist. (T pp. 65-70)

At the time mother signed the consent order terminating her custody rights to non-supervised contact, she believed that

father and step mother would make the arrangement flexible, that they would allow visits in the park and invite her for dinner in their home, but once the agreement was signed they took the position that the court order did not permit them to do so. (T p. 70)

When the mother attempted to initiate her supervised visits she was told that Misty Isle Bridges needed to receive a copy of the court order which had not been given to her by father's attorney. She asked the father and stepmother about it and was told that father had not received a copy of the order either. Father did not receive a copy of the order for a month after signing. (T p.72)

The father and stepmother refused to permit any type of visits even supervised by them unless the Children and Youth investigation was dismissed as unfounded. (T p. 73) Even after the father and stepmother received a copy of the order and were aware that the mother's visits could not be initiated at Misty Isle Bridges without it and that mother did not have a copy of the order they did not offer to give her a copy. They gave her the phone number for their attorney so she could call and see why she had not been sent her copy of the order. (T pp. 75-76)

The father testified as follows:

Q. Were you aware that Kayla did not receive a copy of the signed stipulation?

A. We had notified her when we received ours, and two weeks later, she said that she still had not received hers, which we then gave her contact for [father's attorney's] office, since that's where we signed it, that would be the easiest place for her to obtain a copy for herself.

Q. Were you concerned at all for [child] that she wasn't getting any visitation with her mother when she had previously, at least three weekends a month, you had testified to?

A. That's what she was allotted. She didn't always take them.

Q. But my question was, were you concerned that she wasn't getting any visitation and the reason, at least at the beginning, was that Misty Isle Bridges required the custody order and she didn't have it?

A. I wasn't overly concerned. I was a little concerned, but [child] seem to be coping with it just fine.

Q. But she wouldn't have had to cope if there were other ways to set up the visitation, correct?

A. Correct.
Q. And you chose to not facilitate that supervised visitation whatsoever?

A. I did not feel that it was incumbent upon me to do that work for Kayla.

Q. So you chose to not allow your daughter to have any visitation during that time?

A. I guess. (T pp. 121-122)

The only explanation presented to the court concerning the pictures which were the basis for the indicated finding of child sexual abuse other than the language from Petitioner's Exhibit 1 hereinabove quoted came from the mother:

Q. So I want to talk about what stemmed from the CYS investigation. Can you tell me when you were notified that there was an investigation?

A. I was notified in 2015 of photos that were taken in 2014 of my girls. When they showed me the pictures, I had taken pictures of my girls playing. We were all downstairs playing in the playroom, I mean, the downstairs in the playroom and her little sister was using an exersaucer like a little bit after Christmas. That's what she got for Christmas. [Child] had told me she had to use the bathroom, and she said, well, I want my baby sister to come. I said, you can go to the bathroom. Your baby sister will be fine. You'll be okay. And I was cleaning while they were playing, and I thought she went to the bathroom, and I heard them giggling, so I peeked over, and I saw [Child] was sitting on her potty, and she was playing peekaboo with her sister in the exersaucer. And I'm like, oh, this is adorable, you know, and not thinking, I like took pictures, you know, and I'm like, oh, my gosh, look at this. These two are inseparable. And when I posted them, I posted them in a big group of like 30 photos, and I didn't

think about it, and I own up to that. I should have. But I was notified of the CYS investigation after literally the week after I lost--I didn't want to lose [Child], but I handed her over after a visit, and they had notified--I'm pretty sure it was like the beginning of February when CYS had actually called me to set up saying there's concerns about your child with sexual accusations, and I said oh, my gosh...(T pp.164-165)

Q. So then sometime after that, you were contacted to set up a meeting with Caleb and Annie?

A. Yes. We were actually--we wanted to have our visitation--I was supposed to get her Valentine's Day weekend, which is always a big deal with me and [Child]. We always did a mommy/daughter thing like where we would make dinner together, and we would--I called her my love bug. So I was supposed to get her, and then I contacted them about like getting her that visit and stuff, and they were--we had to have a conversation before and that with [Child's] being sick, we'll go ahead and try--with this going on, just until we know further what's going on. We have no clue what this is about, and we're praying for you, is what Annie and Caleb were telling me. And--I'm sorry, I just--with that, they requested that we have a sit-down conversation, the four of us, and talk things of what we can do because knowing how well things went co--parenting over the holidays and stuff, I was like more trusting of them. So when she had shown me her concern about her degree, she had told me she would lose her degree and she would lose her job sending her with this investigation, that we need to have a sit down conversation to talk about what our options are, that we'll

Op. 10

go ahead and tell [Child] right now what we need to tell her, and then we'll go from what we discussed.

Q. Did you believe that you had to change the custody agreement?

A. With the investigation going on, they had told me that they would terminate my rights then when we were talking, that they wouldn't let me see her at all.

Q. Who told you this?

A. Annie and Caleb told me that the courts, with this investigation, would cut my rights off and that they were willing to set up some kind of supervision like visits where legally, it protects me, but it also lets me get to see them and be open to where we would could set up different times and dates where we could—

Q. And were you represented by counsel during this time?

A. No. I financially couldn't.

Q. You financially couldn't? Is that what you said?

A. I couldn't afford any kind of counsel, especially with the investigation and everything that went on, just--
(Testimony pp.166-168)

Mother stated that the stepmother had told her that they were already having something written up which would provide that until the investigation was completely over that she would be limited to supervised visitations but that in the

Op. 11

meantime they would be willing to "set up like park dates or they would--we could meet for dinners or movies, something where all of us can be together. That way, nobody can be held accountable for anything if anything was to come out, that they didn't see me as a threat of anything."(T pp. 168-169)

The mother called Misty Isle Bridges the next day after signing the order to set up her visitations but was told that Misty Isle Bridges could do nothing until they received the court order. The mother also drove with her boyfriend's mother to find the location of Misty Isle Bridges within a week of signing the custody stipulation. (T pp. 171-172)

The mother contacted the father's attorney's office to request the order and was told, "They said there was nothing they can do." (T p. 173)

The mother did not receive the order until August 31, 2016. The father's attorney who prepared the stipulation and order took the position that it was the responsibility of the mother to make sure that the court had her current address. (T pp. 214-215)

The mother explained the initiation of her phone contacts,

> Q. In the meantime, being that you couldn't set up your supervised visitations, what type of contact did you have with [Child]?

A. I would have phone conversations after a little bit. [Stepmother] had told me--expressed to me about how [Child] was having a hard time with electronic devices, that she didn't like her pictures taken anymore or she was leery about being on the phone or face time. I suggested face time because my mother-in-law had an IPhone and I know he had an IPhone, so I figured, you know, my youngest daughter can't talk, and that way they could see each other, but mainly phone calls with on-and-off when allowed and we could schedule these things.

Q. When you say when allowed, what do you mean by that?

A. They were always doing something. There was always this going on or they had this going on, like her gymnastics, too. (T pp. 174

The mother was familiar with the address and contact information for the father throughout the entire lifetime of the Child. (T pp 104-105)

The mother had no custodial time with the child from the initiation of the Children and Youth investigation at the end of January, 2015 to the time of the hearing on termination of parental rights on November 16, 2016. (T pp105-106)

In a phone conversation between mother and the Child between March, 2015 and August, 2015 mother told daughter

that she was waiting on the papers to come in the mail so that she could have in person visitation with the Child. (T p. 128)

The mother had no phone contact with the child from September, 2015 through the time of the hearing on termination of parental rights. (T pp106-107)

The father did not feel comfortable with the mother having supervised visits with the Child until he could question her about where she was in her life. (T pp 118-119)

When the father was contacted by Misty Isle Bridges that the mother wanted to arrange the supervised visits (September 19, 2016) he contacted his attorney to file the papers for termination of parental rights which he had discussed with the attorney previously. Father agreed to a visit twice, but cancelled both times. (T pp123-124)

The mother finally obtained a copy of the court order and delivered it to Misty Isle Bridges on August 31, 2016. (T p. 185)

The mother's attempts at phone communication were resisted by the father and step mother and mother's attempts lessened after a few months. Letters and pictures sent by the mother to [Child] were returned to her. (Transcript pp. 241-245)

The statute involved, 23 Pa.C.S.A. Section 2511 provides that the parental rights of a parent to a child may be terminated after a petition is filed on the grounds stated. Here the only section set forth in the termination petition is section (a) (1) which provides, "The parent, by conduct continuing for a period of at least six months immediately preceding the filing of the petition, either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." In Appellants' statement of matters complained of on appeal Appellant asserts that it was error for the court not to consider section (a)(2) in making the decision in this case, but section (a)(2) was not cited in the petition to terminate. Pa.O.C. Rule 15-4 requires that the petition to terminate include, "(6) facts constituting grounds for the involuntary termination under Section 311 of the Adoption Act, and a reference to the applicable subsection or subsections;..." Since section (a)(2) was not cited in the petition it would be improper for the court to apply that section.

In a termination of parental rights case, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of "clear and convincing evidence" means

testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re Z.P.,* 994 A.2d 1108, 2010 PA Super 56.

The statute permitting involuntary termination of parental rights on the ground of evidencing a settled purpose of relinquishing a parental claim to a child or refusing or failing to perform parental duties must be read in the disjunctive. Termination may be ordered either if the parent has evidenced for a period of six months a settled purpose of relinquishing parental claims or if the parent has, for the same length of time, refused or failed to form parental duties. *Matter of Adoption of Charles E.D.M.II,* 550 Pa. 595, 708 A.2d 88 (1998)

A court may terminate parental rights under section 2511 (a) (1) where the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least the six months prior to the filing of the termination petition. Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the court must consider the whole history of a given case and not mechanically apply the six month statutory provision. The court must examine the individual circumstances of each case and consider all explanations

*Op. 16*

offered by the parent facing termination of her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination. *In Re K.Z.S.*, 946 A.2d 753 (2008), 2008 PA Super 62.

At the conclusion of the hearing when I rendered my decision I may have focused too much on the statutory six month period, and the fact that immediately preceding the filing of the petition the mother was finally getting around to taking the steps necessary to reestablish her custodial rights. There is no doubt that she was trying to get visitation restored prior to the filing of the petition to terminate. I said in my remarks at the conclusion of the hearing that it was almost unfair to the father given the long period she went without contact, but in reviewing the law and looking more closely at the entire period of time and the explanations offered by the mother for not having contact it became clear that the father and step mother were making it difficult for the mother. All circumstances must be considered when analyzing a parent's performance or nonperformance of parental obligations. The parent's performance must be measured in light of what would be expected of an individual in circumstances in which the parent under examination finds herself. Did she use the level of resolve necessary to overcome the obstacles put in her way?

Given her circumstances I believe that she did. I believe her testimony about interference with phone calls and return of letters. I believe her testimony about her efforts to obtain a copy of the court order. From January 31, 2015 to the time of the hearing on termination the father and stepmother were placing or maintaining roadblocks to her ability to parent. There is no evidence that mother ever had an intent to abandon the Child. Mother did not perform parental duties because of the interference of the father and stepmother, and mother was as of August 31, 2016 actively involved in asserting her parental rights by the fact that she had delivered a copy of the court order to Misty Isle Bridges and asked to have her supervised visits established. I also believe her testimony about her previously close relationship with the child and the relationship of the child to her other daughter. Given the foregoing it is clear that father has failed to prove his case by clear and convincing evidence.

Respectfully submitted,

Paul H. Millin

Paul H. Millin, S.J., S.P.

Pennsylvania
County of Clarion SS
I hereby certify to be a true and correct copy of Order
as the same was filed / recorded
Witness my hand and seal at Clarion, Pennsylvania this
day of 20

Register of Wills
Recorder of Deeds
Clerk of Orphans' Court

Op. 18